**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Criminal No. __________** |
| | : | |
| **v.** | : | |
| | : | **18 U.S.C. § 371 (Conspiracy)** |
| | : | |
| **THOMAS HARPER,** | : | |
| | : | |
| **Defendant.** | : | |

# GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING AND MOTION FOR DOWNWARD DEPARTURE UNDER USSG §5K1.1

The United States of America, by and through its attorneys, the United States Attorney for the District of Columbia and the United States Department of Justice, Antitrust Division, respectfully submits its Memorandum in Aid of Sentencing and Motion for Downward Departure, pursuant to section 5K1.1 of the United States Sentencing Guidelines ("USSG" or "Guidelines"). The United States recommends that this Court conclude that the applicable Guidelines range for the defendant, Thomas Harper (hereafter "Harper" or the "Defendant"), is four to ten months, and that the Defendant be sentenced to four months of incarceration, and a term of supervised release of two years. The United States further recommends restitution in the amount of $165,711.06 based on Defendant's receipt of certain compensation from MCC Construction Company. In support thereof, the United States respectfully states the following:

## FACTS

At a plea hearing on June 22, 2016, the Defendant admitted to the following facts:

1. The "8(a) program" is a program administered by the Small Business Administration ("SBA"), a department and agency of the United States. The program is named

for Section 8(a) of the Small Business Act and is a development program that was created to help small, disadvantaged businesses compete in the American economy and access the federal procurement market. To qualify for the 8(a) program, a business (commonly referred to by the SBA and other government agencies as the "firm") must be at least 51% owned and controlled by a U.S. citizen (or citizens) of good character who meet the SBA's definition of socially and economically disadvantaged. The firm also must be a small business (as defined by the SBA) and show a reasonable potential for success.

2. The SBA's 8(a) program exists, among other reasons, to facilitate the economic development of competitive small businesses that contribute to the overall health of the U.S. economy. The program also exists to ensure that large corporations do not gain monopoly positions with respect to U.S. government contracting. The SBA's 8(a) program furthers the additional goal of developing competitive small businesses owned by historically disadvantaged socioeconomic groups. The U.S. government agencies that award 8(a) contracts further these goals by, among other things, awarding contracts on either a set-aside basis, where the only competitive bidding is among similarly eligible firms, or on a sole-source basis, without competitive bidding. In doing so, those agencies further the congressional intent of the 8(a) program by ensuring that 8(a) firms (and not other, ineligible firms) receive the benefit of the profits from the awarded contracts and the benefit of performing the volume of business from those contracts.

3. As a prerequisite to participation in the 8(a) program and to further payment under any government contracts subsequently awarded through that program, a firm must apply and qualify for participation in the 8(a) program through a formal SBA-administered application process. In addition, all 8(a) firms must submit annual reviews that the SBA uses to monitor

eligibility. Firms can remain in the 8(a) program for up to nine years provided they maintain that eligibility, at which point the SBA considers a firm to have "graduated" from the 8(a) program. Once a small business graduates from the program, it is no longer eligible to obtain government contracts reserved for Section 8(a) program participants.

4. The SBA can revoke a firm's 8(a) status during that nine-year term by "graduating" it early if the agency determines that it no longer meets the criteria for certification. SBA regulations require firms to inform the SBA of any changes that would adversely affect program eligibility while they are participating in the 8(a) program. The SBA also may terminate a firm from the 8(a) program for good cause, such as submission of false information or failure to maintain eligibility requirements. After a firm loses its 8(a) eligibility, it cannot reapply, even if it changes its name or management. Similarly, after a firm loses 8(a) status, the disadvantaged individual upon whom eligibility was based is no longer eligible to qualify with another firm.

5. Participants in the 8(a) program are subject to regulatory and contractual limits on subcontracting work from 8(a) set-aside contracts. The SBA regulations require, among other things, the 8(a) concern to agree that on construction contracts it "will perform at least 15 percent of the cost of the contract with its own employees (not including the costs of materials)." 13 C.F.R. § 125.6(a)(3). Likewise, the Federal Acquisition Regulation ("FAR") requires all contracting officers for the Government to include a clause in 8(a) set-aside contracts, which recites the applicable restriction on subcontracting. 48 C.F.R. § 19.811–3 (requiring contract officers to put clause 52.219–14, Limitations on Subcontracting, in any solicitation and contract arising from 8(a) contracting). Clause 52.219–14 reads, in pertinent part, "[b]y submission of an offer and execution of a contract, the Offeror/Contractor agrees that in performance of the

contract in the case of a contract for . . . general construction the concern will perform at least 15 percent of the cost of the contract, not including the cost of materials, with its own employees." 48 C.F.R. § 52.219–14(c). The limitation on subcontracting is both a regulatory and contractual requirement for contractors to receive the benefits of the 8(a) Program.

6. The SBA also administers the Historically Underutilized Business Zone ("HUBZone") program. To qualify for the HUBZone program, a company must establish that: i) it is a small business; ii) it maintains a principal office located within an area that has been designated as a HUBZone; and iii) at least 35% of its employees reside within designated HUBZone areas. 13 C.F.R. § 126. A company that applies for, and is granted, HUBZone status by the SBA qualifies to receive federal government contracts that are set aside for certified HUBZone companies. A HUBZone-certified company is obligated to immediately inform the SBA of any material changes in its status. Such changes would include a change in ownership, a change in primary business address, a change in business structure, or a change in the company's compliance with the 35% residency requirement. For construction contracts, the HUBZone business must perform, at least, 15% of the cost of contract performance incurred for personnel on the HUBZone company's employees.

**Background**

7. MCC Construction Corporation ("MCC") was a construction management company and a general contractor that provided design/build, renovation/restoration, and new construction services. It was founded in 1986, and its home office was located in Greenwood Village, Colorado, with regional offices in different parts of the country. MCC was actively managed by Harper, Person D, Person F, and Crummy, who were owners of MCC.

8. Far East purported to specialize in, among other things, design build services of energy and renewable programs; general contracting and construction staffing services; and mechanical, electrical, plumbing, renovation, and carpentry. At all relevant times, Far East was certified to participate in the 8(a) program and was headquartered in Illinois. Far East's primary business address was the home address of relatives of Cho. For portions of the relevant period, Far East was also certified to participate in the HUBZone program.

9. Company 2 purported to specialize in, among other things, design build services of energy and renewable programs; general contracting and construction staffing services; and mechanical, electrical, plumbing, renovation, and carpentry. At all relevant times, Company 2 was certified to participate in the 8(a) program. Company 2 routinely used Far East's business address as one of its addresses.

10. Michelle Cho ("Cho") resided in Illinois. At various times throughout the relevant period, Cho held officer positions with Far East and Company 2.

11. At all relevant times, Harper was an officer of MCC and one of the owners of the company, as a minority shareholder who owned 5.78%. He was the Vice President of the Northeast Region. In this role, he was responsible for overseeing construction of projects in the Northeast Region, and in late 2009, Harper was further delegated responsibility to reorganize operations. Sometime in early 2008, Person D delegated Harper to be the interface between MCC and Far East, which was a small part of his overall job responsibilities.

12. At all relevant times, Person D was an officer of MCC and one of the owners of the company.

13. For portions of the relevant period, Person F was an officer of MCC and one of the owners of the company.

14. At all relevant times, Walter Crummy ("Crummy") was an officer of MCC and one of the owners of the company.

**Scheme to Defraud at MCC**

15. MCC executed and caused to be executed a scheme and artifice to defraud the United States and to obtain money or property by means of false and fraudulent pretenses, representations, and promises, in relation to procurements for services with several of the contracts awarded valued at more than $1,000,000.

16. MCC engaged in and executed a scheme from, at least, in or around January 2008, through in or around August 2013, to defraud a number of government agencies, including the Small Business Administration ("SBA"); the General Services Administration ("GSA"); U.S. Army, Mission and Installation Contracting Command; U.S. Navy, Naval Facilities Engineering Command; U.S. Air Force, Air Force Material Command; U.S. Department of Commerce; U.S. Coast Guard, Civil Engineering Unit; U.S. Army Corps of Engineers; U.S. Fish and Wildlife Service; and U.S. Property and Fiscal Office for California by, among other things: (i) operating Far East and Company 2 as entities with titled owners over whom MCC exerted impermissible control; (ii) concealing that MCC, which was not eligible for the aforementioned SBA contracting preferences, exercised impermissible control over Far East and Company 2; (iii) causing misrepresentations that Far East and Company 2 were in compliance with SBA regulations pertaining to Far East's and Company 2's contracts, including that Far East and Company 2 employees had performed the required percentage of work on those contracts; (iv) engaging in deceptive practices to make it appear that MCC employees were actually employees of Far East and Company 2; and (v) obtaining, at least, approximately $70,274,894 in U.S. government contracts as a result of false and misleading conduct.

17. As described in greater detail below, MCC participated in the scheme described above to obtain U.S. government contracts based on SBA–administered contracting preferences to which MCC was not entitled, and MCC did so for the purpose of enabling MCC and others to benefit improperly from the payments received in relation to those contracts, the volume of business performed pursuant to those contracts, and the expected future gain from performing those contracts.

## Criminal Conduct

*MCC and Far East Agreed to Unlawfully Use Far East's Small-Business Status to Obtain Contracts for which MCC Was Not Eligible*

18. In and around February 2008, Person D, on behalf of MCC, and Far East signed a teaming agreement related to the first of the approximately $70 million worth of contracts obtained through this scheme. According to the terms of the agreement, which had been reviewed and approved by MCC's external legal counsel, Far East was responsible for contract delivery efforts and there were supposed to be clear delineations of responsibility between MCC and Far East. For instance, the agreement required that Far East "prepare the competitive proposal, integrate the information provided by [MCC], and submit the competitive proposal to the [contracting agency]." If a contract was awarded, Far East was to "[s]upply, as salaried employees, the contract manager and quality control staff with assistance of [MCC]." The agreement also made clear that, with limited exception, "neither Party will be liable to the other for any costs, expenses, risks, or liabilities arising out of the other Party's participation in the preparation, submission, or sustaining of competitive proposals under the Solicitation." A number of these clear responsibilities were added to the teaming agreement by MCC's external legal counsel so that the teaming arrangement would comply with applicable SBA rules and

regulations. MCC entered into similar teaming agreements on other contracts they jointly pursued.

19. Cho and MCC violated central requirements of both the teaming agreements and the SBA rules and regulations. For instance, on or about January 16, 2008, Person D, on behalf of MCC, and one of Cho's relatives, on behalf of Far East, entered into a profit distribution and cost reimbursement agreement. Among other things the agreement noted that MCC would reimburse Far East, the purported prime contractor on the project, for any costs that Far East incurred on the project. In short, MCC, as the supposed subcontractor, bore the financial risk, not Far East, the purported prime contractor. This notion—that MCC would reimburse Far East for its expenses associated with projects—was a core feature of the relationship between MCC and Far East. Such reimbursements, though, violated both the teaming agreement that had been approved by MCC's external legal counsel and applicable SBA rules and regulations.

20. On or about January 17, 2008—the day after MCC and Far East executed the reimbursement agreement—Person F emailed Harper, Person D, and Crummy guidance that discussed the "perils" and "pitfalls" of teaming agreements, addressing, among other subjects, the fact that the prime contractor must have a defined role that allows it to meet its legal obligations. The guidance also noted that a "proposed subcontractor must not have a role in contract management, particularly, a role where subcontractor employees are the key personnel to interact with agency technical managers." While Harper was not responsible for negotiating this teaming agreement, he later became aware that MCC and Far East had entered into a teaming agreement, and Person F and Person D told him it was Person F's responsibility to make sure teaming agreements were in place for every contract with Far East, and the teaming agreements were approved by MCC.

21. Despite this knowledge, MCC took steps to exercise impermissible control over Far East, and also took steps to conceal from the government the extent of MCC's control over Far East. In and around 2008, MCC submitted a proposal on Far East's behalf, which Harper was not responsible for creating or submitting. Harper was told by Person D and Person F that the proposal was submitted on behalf of the Far East Team, comprising a combination of MCC and Far East. On January 31, 2008, with the approval of his superiors, Harper sought and received Cho's permission to create email addresses for MCC personnel that included Far East's name in the domain name—[@FarEastTeam.com].

22. In and around early 2008, MCC submitted a task order and contract bids on Far East's behalf and falsely represented in these submissions that they were employees of Far East. These false submissions caused government contracting officers to believe that employees of MCC—a firm that was not 8(a) eligible—were employees of Far East, a firm that was 8(a) eligible.

23. By way of example, in or around June 2008, Far East was awarded a contract that only a HUBZone firm was eligible to receive for a multi-year construction project on a military base. This multi-year project was administered through a series of task orders that required Far East to submit bids for different components of the project. MCC and Far East would ultimately generate over $30 million in revenue in connection with the multi-year construction project at this military base.

24. On or about June 11, 2008, the Department of Defense—in response to a bid submitted by MCC that identified Harper, an MCC owner, as being affiliated with Far East—sent an award letter to Harper identifying him as being affiliated with Far East. Far East was awarded the contract, yet the award letter was addressed to Harper at Far East's business

address—an address at which Harper never worked. Indeed, this supposed business address was simply a residence occupied by family members of Cho. Harper did not authorize this business address to be represented as the address of Far East.

25. MCC also took steps to ensure that MCC's name did not appear on documents that were critical to these contracts being fulfilled. By way of example, on or about June 17, 2008, Crummy forwarded a question to Harper and Person D asking which company's name should appear on the bond for a multi-year project. After being told by Person F that MCC was providing bonding support for Far East, Harper responded to the request by writing, "[Far East] Please. MCC is not on this contract so please do not put our name anywhere on the bond." The responsibility for negotiating, arranging for, and signing the bond within MCC fell on Person D, Person F, and Crummy.

26. In and around 2008, Far East and MCC agreed that MCC would be responsible for managing more of the labor required to complete the contract than would be allowed under the SBA's 8(a) and HUBZone regulations, and for paying these labor costs.

27. On or about September 23, 2008, an MCC employee forwarded to Harper, Person D, Person F, and Crummy a Department of Justice press release reporting criminal guilty pleas in connection with a scheme in which a small business used its preference to obtain contracts and then unlawfully passed those contracts and the revenue for the contracts to large companies in exchange for a small fixed fee. In the email forwarding the press release, the MCC employee wrote, "read the following by US Department of Justice—*some of it sounds really close to what MCC is doing*—my biggest concern also is—is MCC setting up accounts to receive payment from the government (control the account) if so I don't believe this would be legal?" (Emphasis added.) Harper addressed this employee's concerns stating "I [do] not believe that

this is illegal, . . . however it does show affiliation. . . Again, not illegal, but ground for removal from a contract." Instead, MCC personnel began taking additional steps to conceal from the government the nature of the relationship between MCC and Far East.

*Harper and Others Obstructed an SBA Proceeding into Whether a Bid Submitted by MCC on Behalf of Far East Violated SBA Rules and Regulations*

28. In and around 2008, MCC took steps to conceal the extent of the relationship between MCC and Far East from the government, although it disclosed that a relationship existed between the two companies. Even these limited disclosures prompted questions from at least one contracting agency.

29. On or about August 18, 2008, MCC submitted a proposal that purported to be from Far East for a GSA solicitation related to a building in Boston ("the Boston Solicitation"). Harper was not involved in drafting this proposal. The proposal made numerous references to MCC and provided resumes for a number of the key personnel for the project which revealed that these individuals were MCC employees.

30. On or about November 17, 2008, a GSA contracting officer sent a letter to Cho, explaining that Far East was in the competitive range for the Boston Solicitation, but asking Far East to address weaknesses and deficiencies identified in the bid. Among other things, the contracting officer asked Cho to explain the relationship between Far East and MCC and to confirm that Far East would be able to meet the minimum work requirements under the regulations—that is, performing at least 15% of the cost of the contract, not including the cost of materials, with its own employees.

31. On or about November 18, 2008, Cho sent a letter to the GSA contracting officer affirming that Far East would meet the minimum work requirement if GSA awarded Far East the Boston Solicitation. Cho claimed that Far East would meet its requirements by handling project

management and quality control. Cho made this representation despite the fact that no plans existed for Far East to actually provide these services. Cho further represented that Far East personnel would respond to government requests for proposals. While Harper was not involved in drafting this proposal, Cho made this representation despite the fact that MCC personnel, posing as Far East personnel, responded directly to the government on contracts awarded to Far East prior to November 18, 2008.

32. The November 18, 2008, letter did not satisfy the GSA contracting officer's concerns. On or about November 21, 2008, the contracting officer sent an email to Cho further questioning the nature of the relationship between MCC and Far East.

33. On or about November 21, 2008—the same day the contracting officer emailed Cho seeking additional information—Harper, Person D, and Person F discussed, by email, how they should address this inquiry from the GSA contracting officer. After speaking with Cho on the telephone, Harper specifically relayed the information Cho had told him in a telephone conversation: "[GSA is] taking a hard line on the word Teaming, and using it to say we are a large business by being affiliated. . . . *We* need to craft ourselves as a subcontractor and get away from the word team." (Emphasis added.) Person D responded by cautioning that "[w]e are walking on very soft soil here," and asking "[d]o we walk away at this point and hope that no hands get slapped??" Because Person F told Harper that teaming agreements had been reviewed by MCC counsel, Harper responded saying "I don't think the consequence is punishment, just that we don't get on the contract. . . . I think we put forth our best response and see if it gets us on the contract." When a conclusion was reached that Far East and MCC might not be able to provide a satisfactory answer about the nature of the relationship between the two companies,

Person F ultimately suggested that Far East and MCC simply not respond to the question from the contracting officer.

34. On or about November 24, 2008, Person F sent an email to Harper, Person D, and Crummy expressing concerns about the implications of an adverse ruling from a government agency on the relationship between MCC and Far East. First, Person F recognized that an adverse decision seemed unavoidable, and noted that: "the outcome of any response we submit seems to be demonstrably clear—we are going to have a government agency tell us that our 'arrangement' fails to meet the definition of a small business and we are in fact affiliated." Second, Person F recognized that such a determination could have ramifications beyond the Boston Solicitation: "going forward this has the potential create [sic] some serious problems should we continue to pursue contracts under the this [sic] relationship. There are some obvious ethics rules that come in to play and I certainly don't want to be the one to tell any other agency/investigator that our relationship had been flagged on other solicitations." Person F concluded his email by recommending that MCC find a solution that avoided a ruling from the GSA:

> The point is this; why push a Government organization to make an official determination (most likely made by the SBA) when the outcome is preordained? By far the best approach would be not to respond at all. The issue disappears and we still have our virginity. Third base, hopefully, won't be part of the record and we can at least say with a straight face that we're virgins. If it too [sic] late, we're screwed already and it won't matter.

35. At virtually the same time that Cho was assuring GSA of Far East's compliance and Harper, Person D, Person F, and Crummy were discussing whether an adverse government agency ruling on the Boston Solicitation might create disclosure obligations on any other bids submitted with Far East, Far East and MCC implemented operating procedures that made Far

East nothing more than a pass through for the contracts Far East subcontracted to MCC. These procedures were set up by Person D and Crummy. On or about November, 20, 2008, a Far East contract specialist informed Harper that Far East just received a payment from the government of approximately $66,000 and asked Harper what Far East should do with this payment and all other payments Far East received where MCC was the subcontractor. Harper responded based on what Crummy, who handled the accounting for MCC, had told him. The following exchange occurred between Harper and Far East's contract specialist:

Harper: You send us the whole thing.

Far East Employee: ok so just to confirm on every project with MCC we will pay the entire amount received in the bank account. . . .

Harper: That's correct [Far East Employee], it will always be the entire amount.

36. On or about December 19, 2008, GSA notified offerors that Far East was an apparent successful offeror for the Boston Solicitation. That same day, though, the GSA contracting officer filed a protest with the SBA, claiming that Far East was other than a small business for purposes of the Boston Solicitation because of the relationship between Far East and MCC.

37. Without copying Harper, on or about January 7, 2009, Cho sent a letter to SBA claiming that "MCC will be utilized as a subcontractor, ONLY, when deemed necessary by [Far East]." The letter also represented, in spite of the fact that MCC and Far East had teaming agreements for the previous contracts Far East was awarded, that "no teaming agreement, joint venture, or subcontract is in place with MCC on this proposal." The letter falsely represented that "MCC has no control over [Far East] in regards to its decision making abilities. We have never operated that way . . . ." That same day, Cho forwarded Harper a January 5, 2009, letter

from SBA to Far East informing Far East that SBA had opened Size Determination Case, 4-2009-18 to address a protest that had been filed against Far East in connection with the Boston Solicitation.

38. On or about January 8, 2009, Harper forwarded the January 5, 2009, SBA letter to Person D and Crummy and discussed with Person D, Person F, and Crummy how MCC should respond to the SBA Size Determination Case.

39. On or about January 12, 2009, a Far East contract specialist sent an email to SBA claiming that "The ONLY relationship that exists between [Far East] and MCC is that of a Prime Contractor/Subcontractor." With respect to the use of the word "team" in the proposal, the email claims that "[t]he word 'Team' was used ONLY to mean prime contractor/subcontractor relationship. We did NOT intend it to mean a teaming agreement relationship [sic] between [Far East] and MCC or that MCC was exclusive to this contract." The email further asserted that "MCC is not any more important than any other subcontractor."

40. On or about January 13, 2009, with and at the direction of Cho and others at MCC, Harper, copying Cho, emailed the SBA falsely claiming that "[Far East] has told us, that MCC would be treated like any other subcontractor . . . . We have no teaming agreement in place, and we have no intention of entering a teaming arrangement with [Far East] on this solicitation. [Far East], with our approval, did request information on our company to feature as a subcontractor." Although Cho told Harper these things, Harper knew that the representations ran counter to how Harper understood Far East and MCC interacted on contracts Far East subcontracted to MCC both prior to, and after, these representations. Moreover, the representations made by Harper misleadingly created the impression that Far East submitted the

proposal for the Boston Solicitation when, in truth and in fact, MCC prepared and submitted the document.

41. On or about January 16, 2009, a Far East contract specialist sent an email to SBA, copying Harper, in which she attempted to clarify Far East's statement that "[MCC and Far East] have teamed together successfully on other contracts." The Far East contract specialist falsely claimed that statement was "in reference to a proposal for a Casino Renovation in New Town, ND. This project is a non federal, open procurement where MCC was one of the featured subcontractors." Harper knew this representation was false and did not correct it.

42. On or about January 22, 2009, the SBA—despite the false and misleading assurances offered by Harper and Far East—issued a determination, concluding, for purposes of the Boston Solicitation, that Far East was other than a small business. Among other things, the SBA noted, for purposes of this solicitation, that Far East's "heavy reliance on MCC [was] patently clear" from Far East's proposal; that every resume submitted with the proposal was an MCC employee, not a Far East employee; and that the proposal repeatedly identified MCC, not Far East, personnel as the individuals who would be responsible for satisfying solicitation requirements. The SBA concluded that, for purposes of the Boston Solicitation, "Far East's ability to perform depend[ed] heavily, if not entirely, on MCC's experience, expertise, and personnel."

43. In addition to concluding that Far East was other than a small business for purposes of the Boston Solicitation, the SBA also noted the contradiction between the materials submitted for the Boston Solicitation and Cho's and MCC's subsequent representations:

> This determination depends upon choosing between two contradictory presentations from [Far East]: the proposal submitted to GSA in order to win the solicitation or subsequent e-mails sent .

> . . to explain its position. The two cannot be reconciled inasmuch as the proposal so clearly and unambiguously describes a team, complete with staffing decisions and clear lines of responsibility.

Harper did not disclose the SBA's determination to outside counsel nor is he aware whether anyone from MCC did so.

*Despite the Unambiguous Warnings from SBA About the Disqualifying Nature of Their Relationship, MCC and Companies Controlled by Cho Continued Their Unlawful Relationship, Routinely Taking Steps to Conceal the Extent of Their Relationship*

44. Despite the clear warning from SBA, MCC continued to prepare and to submit proposals on behalf of Far East. By way of example, on January 27, 2009—less than a week after the SBA determination, MCC began preparing a proposal in Far East's name that was in part reviewed by Harper.

45. Mere months after receiving SBA's decision on the Boston Solicitation, MCC and Far East took steps to formalize the exact type of relationship that the SBA explained would disqualify Far East as a small business concern. MCC subsequently entered into similar relationships. MCC, Far East, and Company 2 misrepresented to contracting agencies the extent of their relationship, and MCC took affirmative steps to conceal its control over the contracts awarded to Far East and Company 2. MCC used Far East's and Company 2's status as small business concerns to obtain tens of millions of dollars of contracts after SBA's January 22, 2009, decision.

**A. Unlawful Financial and Labor Arrangement**

46. In and around July 2, 2009, MCC and Far East negotiated, drafted, and adopted addendums to their existing profit and cost reimbursement agreement. These addendums included the following provisions:

> 3. Upon award of each and every task order under the Contract by the Government to [Far East], [Far East] will

award a subcontract for that task order in the amount of 97% of the amount of that task order to MCC.

4. MCC will furnish all labor, equipment, material safety and supervision to perform the respective scope of work of the task order.

. . . .

6. Upon agreement with MCC, if [Far East] executes a subcontract directly with a subcontractor for a portion of the scope of work of a specific task order, then [Far East] will deduct that amount from its subcontract agreement with MCC however MCC will continue to be responsible for the supervision of that subcontractor unless another written agreement is executed.

7. MCC will pay all site overhead costs . . . .

These principles—that MCC would provide all labor, equipment, material safety and supervision and receive 97% of the task order amount—became the operating principles for contracts that Far East and Company 2 subsequently obtained and subcontracted to MCC. Under this arrangement, Far East and Company 2 lent their names and small-business status and MCC bore nearly all of the expenses of actually fulfilling these contracts. The agreement, by its terms, meant that Far East and Company 2 would be violating the requirement that it perform at least 15% of the cost of the contract, not including the cost of materials, with its own employees.

47. Harper, Person D, and Crummy openly discussed the fact that Far East was not performing any work on these projects and were getting expenses incurred reimbursed by MCC. By way of example, on December 24, 2009, Harper, Person D, and Crummy discussed, via email, a request from Cho that MCC treat the cost of Far East's accountant as a cost for which MCC reimbursed Far East. In proposing a strategy for dealing with Cho's request to his superiors, Harper wrote to Person D and Crummy, "I really think [Cho] needs to consider the reality of the situation, *which in my opinion is us handing her large returns for no risk and no*

*work.* This must of course be done carefully, since a very large and profitable part of our work in the NE is with [Cho]." (Emphasis Added). In speculating about what prompted this request from Cho, Harper wrote, "[i]n the end the real issue is that they see good money coming our way and their share is reduced by having to pay an accountant and an admin to help count and track all of it. The pain of success, we all wish we didn't need those darn accountants."

48. In or around February 24, 2010, Cho requested that MCC reimburse Far East for its insurance expenses. At times, Harper raised concerns about Far East's meeting the SBA work requirements, as well as Far East getting expenses incurred reimbursed by MCC, with Person D and Crummy, and Harper was advised that this was not his responsibility. On or about February 25, 2010, Person D wrote to Harper and Crummy, in reaction to Cho's request, "[d]oes [Cho] pay for anything???" In light of concerns about Far East's and Company 2's performance, Harper, during an Executive Board Conference Call on February 18, 2011, reminded the group that they should "be very aware of the need to make sure we monitor Company 2 and help them meet the 15% self-performance requirements on any project we do with them."

**B. MCC's Impermissible Control of Far East and Company 2**

49. In addition to entering into an agreement about subcontracting labor, MCC, with Cho's permission, also exercised impermissible control over the business activities of Far East and Company 2, routinely bidding contracts in their names and directly submitting invoices to the government in their names.

50. By way of example, on or about May 14, 2009, an MCC employee notified a Far East employee of a project that had been awarded to Far East. On or about May 18, 2009, the Far East employee asked for the documents MCC submitted on behalf of Far East because Far

East had not been provided the bid documents prior to when MCC submitted them to the contracting agency.

51. An email exchange on May 19, 2009, illustrates Far East's lack of input into the bidding process. A Far East employee, who needed to document for an audit how Far East estimates cost, had to contact Crummy at MCC to learn how costs were calculated for contracts submitted in Far East's name. Reflecting the reality that MCC was bidding contracts for Far East and Company 2, MCC routinely submitted invoices to contracting agencies on behalf and in the names of Far East and Company 2. While Harper was informed that MCC was submitting invoices on behalf of Far East, he was told by Crummy that MCC sent copies of the invoices to Far East. However, an accountant who was retained by Far East to prepare more accurate financials for the Company explained in an October 24, 2011, email that "one of the things I found is that we do not get copies of the invoices that MCC submits to the government until MCC pays [Far East] which can be 2-3 months later." Therefore, this arrangement frequently caused accounting difficulties for Far East, as Far East would receive payments from contracting agencies and, at times, be unable to tie these payments to particular projects because they lacked the invoice that MCC issued to the contracting agency.

### C. MCC Engaged in False and Misleading Conduct to Make It Appear that They Were Far East Employees

52. When interacting with the government on behalf of Far East, some MCC employees used email addresses that had Far East's name in the domain address. These emails from MCC employees, but not Harper, often included signature blocks identifying themselves as Far East employees. By way of example, in and around April 2010, Crummy, an MCC owner, exchanged emails with a contracting agency about the status of payments to Far East. Crummy's

email address had a domain name that included Far East's name, and the signature block of his email address identified his organization as Far East. Moreover, Crummy wrote the emails in a way that suggested that he was a Far East employee.

53. In addition, some MCC employees used letterhead bearing Far East's name when sending official correspondence to contracting agencies. And when these employees submitted task orders, bids, statements of work, invoices, and other documents on behalf of MCC, these personnel identified themselves as Far East employees.

54. Moreover, after the problems with the Boston solicitation, MCC and Far East stripped information from resumes that reflected that key personnel were MCC employees. By way of example, on or about February 5, 2009, a Far East employee, after reviewing a bid that MCC prepared on behalf of Far East, sent an email stating "shouldn't we show the [Project Manager], [Quality Control Manager], and Safety Manager as [Far East] employees?" While Harper did not agree to show these MCC employees as Far East employees, he responded, "I agree, we should take MCC out of their resumes." The resumes for key employees were ultimately amended to remove any reference to the MCC employees' current place of employment. Moreover, the proposal was drafted in such a way to suggest that these individuals were Far East, not MCC employees.

**D. MCC and Cho Conspired to Create Straw Employees**

55. On some of the contracts obtained through this scheme, MCC and Far East conspired to make it appear that Far East paid for and controlled employees who worked on Far East project sites. In actuality, MCC paid for these employees and managed them. This practice was memorialized in a July 2, 2009, addendum to an agreement between MCC and Far East regarding a contract Far East obtained at a military base. The relevant provision reads:

> 5. Far East will provide two employees, currently [Nominal Employee 1] and [Nominal Employee 2], and MCC will reimburse Far East for the payroll cost of those two employees upon receipt of an invoice from Allstates Technical Services, LLC. Those reimbursed amounts will be charged to the task orders as noted on the employees' time sheets.

In short, Far East would pay the labor agency for the cost of these two employees, but would be reimbursed by MCC for any such expenses.

56. On or about December 23, 2009, Cho called Crummy and discussed a number of issues, including Cho's concern about meeting Far East's requirement that it perform at least 15% of the cost of the contract, not including the cost of materials, with its own employees. In a December 24, 2009, email summarizing the conversation, Crummy explained the concern, "[Cho] then expressed concern that if MCC was paying for [Nominal Employee 1, Nominal Employee 2, and Nominal Employee 3] that would be a problem. [Cho] indicated that [Far East] could pay for some of these people and then be reimbursed when the owner billings are received." Accordingly, even though Cho acknowledged that MCC reimbursing Far East for these nominal employees would be a problem under the self-performance requirement, the solution was not that Far East would start paying the expenses of these nominal employees and managing them. Instead, the proposed solution by Cho was that MCC would reimburse Far East for the expenses of these nominal employees in a way that made the reimbursement less transparent. Crummy sent the email summarizing this concern and the proposed solution to Harper and Person D.

*Contracts MCC Obtained Through the Scheme*

57. Throughout the relevant period, Far East and Company 2 obtained the following contracts that they subcontracted to MCC with MCC obtaining the following revenue from these contracts:

| Award Recipient | Contract Name | Contract Number | Award Date | Date Complete | MCC Revenue |
|---|---|---|---|---|---|
| Far East | Fort Jackson | W911SE-08-D-0008 | 6/30/08 | 6/3/13 | $30,728,812 |
| Far East | Fresno NG-Solar | W912LA-08-C-6001 | 7/31/08 | 1/12/09 | $1,803,102 |
| Far East | Pennsylvania | N40085-08-C-2871 | 9/12/08 | 6/18/10 | $4,393,386 |
| Far East | Willow Grove | N40085-08-C-2813 | 9/29/08 | 3/13/09 | $321,161 |
| Far East | Mississippi | W912C6-08-P-0168 | 9/30/08 | 12/1/08 | $48,744 |
| Far East | Main Gate | N40085-09-C-0111 | 4/17/09 | 9/30/09 | $180,405 |
| Far East | GSA – SC | GS-04P-09-EXD-0047 | 6/29/09 | 4/22/13 | $558,099 |
| Far East | Arnold AFB | FA9101-09-D-0030 | 7/9/09 | 5/15/12 | $3,272,081 |
| Far East | Fort Collins | SB1341-09-CN-0093 | 7/29/09 | 11/5/09 | $399,300 |
| Far East | New York/Buffalo | W912P4-09-D-0009 | 8/13/09 | 12/7/09 | $240,731 |
| Far East | Mechanicsburg | N40085-09-C-0088 | 9/29/09 | 11/8/10 | $1,239,947 |
| Company 2 | Fort Polk – IED Repair | W9127S-09-C-6013 | 9/29/09 | 6/25/10 | $91,254 |
| Company 2 | Fort Polk – Bldg. 7840 Exp. | W9127S-09-C-6015 | 9/29/09 | 9/12/10 | $346,533 |
| Company 2 | Fort Polk – Secure Storage | W9127S-09-C-6017 | 9/29/09 | 9/15/10 | $268,139 |
| Company 2 | Fort Polk – Eastern Area Res. Office | W9127S-09-C-6018 | 9/30/09 | 3/31/11 | $689,131 |
| Company 2 | Fort Polk – Replace Main | W9127S-09-C-6016 | 10/26/09 | 9/25/10 | $912,186 |

| | | | | | |
|---|---|---|---|---|---|
| | Dist. Panels | | | | |
| Far East | Whitman AFB | W912DQ-09-D-4015 | 12/23/09 | 2/26/13 | $10,421,780 |
| Company 2 | Fort Polk – FOB Barracks | W9127S-09-C-6019 | 12/30/09 | 11/30/11 | $1,303,948 |
| Company 2 | Pennsylvania | N40085-10-C-5862 | 3/16/10 | 10/31/11 | $1,366,711 |
| Company 2 | Substation | N40085-10-C-5863 | 3/25/10 | 12/31/11 | $1,368,296 |
| Far East | Coast Guard – North | HSCGG-110-D-PRV057 | 8/6/10 | 9/30/11 | $842,482 |
| Far East | Fish & Wildlife | 401817D026 | 9/4/10 | 3/31/12 | $561,432 |
| Company 2 | Fort Polk – Ren. Bldg. 4740 | W9127S-09-C-0292 | 9/16/10 | 3/15/11 | $90,768 |
| Company 2 | Fort Polk – Design & Constr. | W9127S-09-C-6032 | 9/30/10 | 11/30/11 | $1,287,878 |
| Far East | Coast Guard – South | HSCG-821-D-PMVA39 | 2/9/11 | 1/31/13 | $788,895 |
| Company 2 | RI Navy/ D-F JV | N40085-10-D-9430 | 4/27/11 | 8/7/13 | $6,749,693 |
| | | | | **Total:** | **$70,274,894** |

With the exception of GS-04P-09-EXD-0047 and 401817D026, each of these contracts was restricted to either 8(a) or HUBZone firms. The revenue MCC obtained from this scheme with respect to Far East constituted 18% of MCC's total revenue during the relevant period. The revenue MCC obtained from this scheme with respect to both Far East and Company 2 constituted 23% of MCC's total revenue during the relevant period.

58. With respect to the 8(a) and HUBZone contracts above, Far East and Company 2, in furtherance of their respective schemes with MCC, attested to procuring U.S. government agencies that they were eligible SBA 8(a) firms, and MCC, Far East, and Company 2 conspired to submit these false attestations with the intent that the procuring agencies would rely on the attestations in their respective award processes and in providing the listed payments. For the

reasons set forth above, Far East's and Company 2's representations in this regard were false because neither company was a legitimate 8(a) or HUBZone firm and because MCC, which was an 8(a)- and HUBZone-ineligible entity for purposes of the contracts listed above, improperly exerted control over Far East and Company 2.

*Harper Salary and Bonus*

59. Throughout the relevant period, Harper received from MCC the following salary and bonus:

| | 2009 | 2010 | 2011 | 2012 | Total |
|---|---|---|---|---|---|
| Total W2 Salary and bonus | $274,812 | $264,792 | $231,975 | $149,038 | $920,617 |

Harper's total salary and bonus from this period of $920,617. Eighteen percent of this amount would equal $165,711.06.

## STATUTORY PENALTIES

The Defendant faces a maximum sentence of five years of imprisonment; a fine of up to $250,000; a term of supervised release of up to three years; and a $100 special assessment. Draft Presentence Report ("DPSR") ¶¶ 149, 150, 157, 158, 166, 167 (citing relevant statutory sections).

## SENTENCING GUIDELINES AND RESTITUTION

The Guidelines calculation in the DPSR places Defendant's total offense level at 12. DPSR ¶ 95. The DPSR calculates Defendant's criminal history in Category I (0 points). DPSR ¶ 98. The DPSR concludes that the applicable Guideline range for Defendant is therefore 10 to

16 months[1] of imprisonment and not more than three years of supervised release. DPSR ¶¶ 155, 158. The DPSR also notes that Defendant agreed to pay restitution in the amount of $165,711.06. DPSR ¶ 170. The DPSR finds that the fine range for this offense is $3,000 to $30,000, but the United States has agreed that it will not recommend that a fine be imposed in this matter. DPSR ¶ 168.

## SENTENCING GUIDELINES ANALYSIS

A district court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007) (citation omitted). In addition to the Guidelines, the Court also must consider the factors set forth in 18 U.S.C. § 3553(a), which include (1) the nature and circumstances of the offense and the history and characteristics of the defendant, (2) the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment, (3) the Sentencing Guidelines and related Sentencing Commission policy statements, and (4) the need to avoid unwarranted sentence disparities.

The United States agrees with the DPSR calculation that the total offense level is 12 (10-16 months imprisonment),[2] which is the same range agreed to by the parties in the Plea

---

[1] The plea agreement allowed for Defendant to argue that he was a minor participant in the charged criminal conduct under USSG §3B1.2(b), which would have lowered his total offense level to 10. Defendant has since withdrawn his request for a minor-role guidelines adjustment.

[2] The determinant of that range is the base offense level and relating guidelines calculation described above for Obstruction of Proceedings Before Departments, Agencies, and Committees, in violation of 18 U.S.C. § 1505, which is found in USSG § 2J1.2.

Agreement, prior to consideration of the United States' Motion for a Downward Departure pursuant USSG § 5K1.1. If the Court grants this motion, the defendant's offense level would be nine and his corresponding Guidelines range would be four to ten months of imprisonment. This range places the Defendant in Zone B of the USSG Sentencing Table.

The United States also agrees with the Guidelines fine range set forth in the DPSR (¶¶ 168), which is $3,000 to $30,000.[3] However, the United States has agreed that it will not recommend the imposition of a fine. The parties have agreed that, apart from a determination by the Court of whether mandatory restitution applies under 18 U.S.C. § 3663A, Defendant will pay restitution to the United States Treasury in the amount of $165,711.06. This amount is based upon Defendant's receipt of certain salary and bonus compensation between 2009 and 2012 from MCC Construction Company.

**SUBSTANTIAL ASSISTANCE TO AUTHORITIES**

The United States moves for a three-level departure, pursuant to USSG § 5K1.1, based on the Defendant's substantial assistance in the investigation. The Defendant was the first to agree to a voluntary interview and plead guilty in this matter. The Defendant expressed genuine remorse for his conduct at both events. His plea agreement and corresponding Statement of Offense directly led to and/or contributed to the plea agreements of two other conspirators in this SBA fraud scheme. In fact, counsel for one defendant contacted the United States the day after Defendant entered his guilty plea, expressing a desire to resolve his client's potential criminal exposure in the fraudulent scheme. Defendant willingly submitted a declaration to assist the

---

[3] While the parties agreed in the Plea Agreement that the fine range is $5,500 to $55,000, that agreement was based on the admittedly incorrect view that the 2016 Guidelines fine range applies, when, as correctly pointed under in the DPSR, the 2013 Guidelines fine range applies. *See* USSG §§ 5E1.2(c)(3) and (h)(1).

United States in its sentencing memoranda relating to Michelle Cho (16-cr-00186). Defendant also expressed his willingness to testify at trial and/or provide additional information to the United States relating to the fraudulent scheme. As such, the United States respectfully requests that Defendant receive a three-level departure for his substantial assistance in this investigation, that his offense level be lowered to nine, and his corresponding guidelines range be adjusted to four to ten months.

**ARGUMENT**

The Defendant committed a serious offense by obstructing the SBA's investigation into the fraudulent scheme between MCC and Far East. Defendant was also a key player in that scheme to steal more than $70 million in government contracts earmarked for disadvantaged or minority-owned companies. Although not an instigator, he served as the point-of-contact between MCC, Cho, and Far East in perpetrating this enduring and comprehensive fraud upon the government. Through this scheme, the Defendant, MCC, Cho, Far East, Crummy, and others' actions caused substantial harm to the SBA 8(a) and HUBZone programs.

With regard to the conduct underlying Defendant's guilty plea, Defendant lied to the government in an agency proceeding in an attempt to conceal the ongoing nature of the conspiracy between MCC and Far East. He, along with Cho, was a primary perpetrator of obstructing the SBA investigation. On August 18, 2008, MCC submitted a proposal purporting to be from Far East for a GSA solicitation related to a building in Boston ("the Boston Solicitation"). Statement of Offense at ¶ 29 (Dkt. No. 7). Starting in November 2008, a GSA contracting officer questioned the relationship between MCC and Far East, and whether Far East would be able to meet the minimum work requirements under the regulations; that is, perform at least 15% of the cost of the contract with its own employees. *Id.* at ¶¶ 30-32. A short time later,

on December 19, 2008, GSA notified offerors that Far East was the successful offeror for the Boston Solicitation. *Id.* at ¶ 36. However, the GSA contracting officer filed a protest with the SBA that same day, claiming that Far East was other than a small business for purposes of the Boston Solicitation because of its relationship with MCC. *Id.* A size determination proceeding – an official agency proceeding – was opened by the SBA shortly thereafter. *Id.* at ¶ 37.

Cho lied first to the SBA during its size determination proceeding. On January 7, 2009, she falsely told the government that Far East would meet minimum work requirements on the Boston Solicitation by handling project management and quality control, while no such plans to engage in that work on the part of Far East existed. *Id.* She also falsely told the government that MCC was "ONLY" a subcontractor for Far East, and that no teaming agreement with MCC was in place. *Id.* The same day, Cho forwarded Defendant the letter from the SBA informing Far East that the SBA had opened a size determination case and commenced its agency proceeding. *Id.* Six days later, on January 13, 2009, Defendant e-mailed the SBA, falsely claiming that Far East had told MCC that MCC would be treated the same as other subcontractors. *Id.* at ¶ 40. Defendant knew this representation was wrong and that it ran counter to how Far East and MCC interacted on contracts prior to (and ultimately after) this statement. *Id.* Several days later, a Far East contract specialist also e-mailed the SBA, copying Defendant, providing more false information about prior teaming arrangements between Far East and MCC. *Id.* at 41. Defendant knew these representations were false and did nothing to correct them. *Id.* Despite the false and misleading information, the SBA ultimately determined that for purposes of the Boston Solicitation, Far East was not a small business. *Id.* at ¶¶ 42-43/

Defendant's obstructive conduct did not occur in a vacuum. Defendant willingly continued to participate in the overall fraudulent scheme with MCC, Crummy, Cho, Far East,

and others even after learning that the SBA had concerns about the Far East – MCC relationship and had determined that Far East was not a small business for purposes of the Boston Solicitation. Specifically, 21 of the 26 contracts at issue in this case were stolen ***after*** the SBA's determination on the Boston Solicitation in January 2009.

Although Defendant was not the instigator nor mastermind of the fraudulent scheme, he was the designated point of contact between MCC and Cho/Far East – the 8(a) eligible company that MCC used as a pass through to steal more than $70 million in contracts over a five-year period. He knowingly took active steps to conceal the true nature of the MCC–Far East relationship from the government, and then continued to defraud disadvantaged business owners with MCC, Crummy, Cho, Far East, and others after the SBA's determination on the Boston Solicitation. At the same time, the Defendant has no criminal history and the United States believes it is extremely unlikely that he will repeat his criminal behavior in this case. For these reasons, the United States submits that a guidelines range of four to ten months is appropriate in this matter, along with the agreed-upon restitution amount of $165,711.06.

## SENTENCING RECOMMENDATION

In this case, the Defendant's conduct obstructed a government agency proceeding and defrauded important government programs designed to provide eligible, historically disadvantaged individuals with substantial government-contracting business and experience. Defendant's obstruction of an ongoing SBA investigation was part of a larger scheme to conceal from the SBA the extent and nature of the relationship between MCC and Far East. Defendant was a corporate executive and part owner of MCC and played an active role in helping Cho, Far East, and MCC steal tens of millions of dollars' worth of government contracts by flouting the SBA program regulations.

Yet, as mentioned, Defendant was the first to cooperate in the United States' investigation. He agreed to a voluntary interview and entered a plea of guilty prior to any other individual defendants in this investigation, and his guilty plea led directly to and/or contributed to the guilty pleas of two additional conspirators. Defendant willingly submitted a declaration in support of the United States' sentencing memoranda relating to Cho and was prepared to testify if necessary. Therefore, the United States respectfully requests that its Motion for a Downward Departure under USSG § 5K1.1 be granted, and that the Court conclude that the applicable guidelines range is four to ten months.

For these reasons, and in light of the Defendant's criminal history and role in perpetrating the offense, we ask that the Court sentence the Defendant to four months of incarceration, impose a two-year period of supervised release, a special assessment of $100, and order restitution in the amount of $165,711.06.

Respectfully submitted,

CHANNING D. PHILLIPS
UNITED STATES ATTORNEY
D.C. Bar No. 415793

John Marston
DC Bar No. 493012
Assistant United States Attorneys
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-6886
john.marston@usdoj.gov

LISA M. PHELAN
Chief, Washington Criminal I
Antitrust Division

Justin Murphy /JPM
___________________________
Justin P. Murphy
DC Bar No. 477718
Washington Criminal I, Antitrust Division
United States Department of Justice
450 Fifth Street, N.W., Suite 11300
Washington, D.C. 20530
(202) 598-8670
Justin.Murphy@usdoj.gov